# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANNIA

RIGHT WAY NUTRITION, LLC

*Plaintiff,*

v.

GENERAL NUTRITION CORP.,

*Defendant.*

Civil Action No. 2:17-cv-01669-WSS

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, District Judge

Health and wellness care is one the fastest growing markets in America. Deborah Weinswig, *Wellness is the New Luxury: Is Health and Happy the Future of Retail*, FORBES (June 30, 2017, 4:09 p.m.), https://www.forbes.com/sites/deborahweinswig/2017/06/30/wellness-is-the-new-luxury-is-healthy-and-happy-the-future-of-retail/#26d7147c8323. Plaintiff Right Way Nutrition, LLC ("RWN") and Defendant General Nutrition Corporation ("GNC") entered into a business arrangement to profit from this trend. But their deal unraveled. Litigation ensued. Currently pending before the Court are their cross motions for summary judgment. For the reasons set forth below, RWN's Motion for Partial Summary Judgment (ECF No. 60) will be granted in part and denied in part. GNC's Motion for Partial Summary Judgment (ECF No. 64) will be denied and its Amended Counterclaim (ECF No. 44) will be dismissed.

## FACTUAL BACKGROUND

In 2010, Kevin Wright ("Wright") founded RWN. He currently serves as RWN's President and CEO. RWN specializes in the development of wellness products. GNC is a national retailer of health, wellness, and performance products. In or about late April/early May 2011, GNC

1

entered a deal with RWN to sell two RWN wellness products at GNC stores nationwide and on GNC's website. RWN communicated with GNC daily and visited GNC stores every two weeks for inspection purposes. RWN had access to GNC buyers twenty-four hours a day, seven days a week. RWN National Sales Director Charlie Chiaverini ("Chiaverini"), former Vice President of GNC, was responsible for the GNC account. Appendix to Plaintiff's Motion for Partial Summary Judgment (ECF No. 62) ("Pl.'s App.") Ex. A at pp. 1–15; Pl.'s App. Ex. D at p. 2, ¶ 4; Appendix to Defendant's Motion for Partial Summary Judgment (ECF No. 64) ("Def.'s App.") Ex. 1 at pp. 5–6, 119; Statement of Undisputed Material Facts in Support of General Nutrition Corporation's Motion for Partial Summary Judgment and Response to Plaintiff's Undisputed Material Facts (ECF No. 66) ("Def.'s Statement") at pp. 1–2, 12, ¶¶ 1–5, 76.

## I. The Terms of the Deal

The deal initially consisted of the Purchase Agreement, the Vendor Book,[1] and the Purchase Order Form (collectively, the "founding documents"). Def.'s App. Ex. 1 at pp. 2, 115, 123; Def.'s Statement at pp. 3, 12, ¶¶ 11, 77; Pl.'s Resp. to Def.'s Statement at p. 2, ¶ 11.

Paragraph 8 of the Purchase Agreement required RWN to maintain a $2,000,000.00 general products liability occurrence policy. Pl.'s App. Ex. A at pp. 3–4, ¶ 8. RWN procured such a policy from Citadel Insurance Services, LC. Def.'s App. Ex. 1 at p. 136. Paragraph 9 of the Purchase Agreement, the indemnity clause, required RWN to hold GNC harmless for any litigation arising from the sale of its products under the Purchase Agreement. Pl.'s App. Ex. A at p. 4, ¶ 9.

---

[1] The parties quibble over the name of this document. GNC refers to it as the "Vendor Agreement," whereas RWN refers to it as the "General Nutrition Corporation Vendor Book." *Compare* Def.'s Statement at p. 3, ¶ 12 ("Vendor Agreement"), *with* Pl.'s Response to Def.'s Statement at p. 2, ¶ 12 ("General Nutrition Corporation Vendor Book"). The title of the document is not a fact material to the dispute. The Court will refer to it as the "Vendor Book" because it is so titled in the Purchase Agreement. Pl.'s App. Ex. A at p. 1, ¶ 1.

Paragraph 11 of the Purchase Agreement established the following formula for calculating RWN product's margin percentage:[2]

$$x = \frac{GNC\ Retail\ Price}{RWN\ Product\ Price\ -\ GNC\ Retail\ Price}$$

Pl.'s App. Ex. A at pp. 4–5, ¶ 11. Exhibit Four to the Purchase Agreement contained the General Nutrition Returns Agreement ("GNRA"),[3] which detailed GNC's Reverse Logistics Program. That program allowed GNC to return RWN products to RWN for credit or cash payment. Pl.'s App. Ex. A at p. 10. The GNRA also guaranteed GNC the right to increase costs thirty days after providing written notice to RWN. Pl.'s App. Ex. A at pp. 10–12.

Section F of the Purchase Agreement's General Terms contained a merger clause that provided, in pertinent part, as follows,

> This Agreement (including the Vendor Book, the Purchase Order, and all exhibits) contains the entire agreement of the Parties relating to the subject matter of this Agreement, and the Parties agree that this Agreement supersedes all prior written or oral agreements, representations, and warranties relating to the subject matter of this Agreement. In the event of any conflict between the terms of this Agreement and the Vendor Book, the terms of this Agreement shall control.

---

[2] Although GNC and RWN characterize this provision differently, that difference is not a dispute of material fact. *Compare* Def.'s Statement at p. 3, ¶ 14 ("The purchase agreement also contains a section on margin neutrality, which talks about what happens to the price when a price of a product is reduced in some way."), *with* Pl.'s Resp. to Def.'s Statement at p. 2, ¶ 14 ("Admitted only that Section 11 of the Purchasing Agreement is entitled 'Margin Neutrality.'").

[3] Although GNC and RWN characterize this provision somewhat differently, that difference does not entail a dispute of material fact. *Compare* Def.'s Statement at p. 3, ¶ 13 ("The Purchase Agreement contains what is referred to as a reverse logistics program which entitles GNC to return or discard product and get a credit from Right Way for various reasons, including when a product becomes outdated."), *with* Pl.'s Resp. to Def.'s Statement at p. 2, ¶ 13 ("Admitted only that Exhibit 4 to the Purchasing Agreement is entitled 'General Nutrition Returns Agreement'").

Section F later states that the parties cannot modify the Purchase Agreement except by a signed writing. Pl.'s App. Ex. A at p. 5, ¶ F. The deal initially covered two RWN products: African Mango and Beta Bum. Pl.'s App. Ex. A at p. 9; Def.'s Statement at p. 13, ¶ 78. The parties subsequently executed addenda modifying the Purchase Agreement to allow GNC to sell new RWN products as they became available.

Whenever GNC wanted to purchase a product from RWN, it had to issue a purchase order. Def.'s App. Ex. 1 at p. 6; Def.'s Statement at p. 3, ¶ 15; Pl.'s Resp. to Def.'s Statement at p. 2, ¶ 15. The Purchase Order Form, which is included in the Vendor Book, states in pertinent part that "The parties agree that the total price stated in the purchase order contains all the charges to be paid by GNC to [RWN]. The price described herein is not subject to escalation of any kind or for any reason." Def.'s App. Ex. 1 at p. 125, ¶ 6. The parties stipulated that Pennsylvania law governed interpretation of the founding documents. Pl.'s App. Ex. 1 at p. 7, ¶ H; Def.'s App. Ex. 1 at p. 91, ¶ H.

## II.     The Disputes Over RWN Products

There are three RWN products at the core of this case: Garcinia Cambogia Extract, Cerebral Success, and Green Coffee Bean+Energy. The Court will recount the controversies involving each product below.

### A.  *Garcinia Cambogia Extract*

In 2013, RWN launched Garcinia Cambogia Extract ("Garcinia") as a new product. RWN and GNC entered price negotiations by email in early January 2013. Def.'s Statement at pp. 6–7, ¶¶ 37–39; Pl.'s Resp. to Def.'s Statement at p. 4, ¶¶ 37–39. GNC contracted with RWN to sell Garcinia and another RWN product—Green Coffee Bean+Energy. GNC initially agreed to pay $14.00/unit for Garcinia. The corresponding retail price was $39.99/ unit. Def.'s App. Ex. 1 at

pp. 139–148. The parties memorialized the sale in Addendum G to the Purchase Agreement on January 23, 2013. Pl.'s App. Ex. A at p. 22; Pl's App Ex. D at p. 2, ¶ 5; Def.'s Statement at p. 7, ¶ 40; Pl.'s Resp. to Def.'s Statement at p. 4, ¶ 40. On February 28, 2013, RWN shipped the first order of Garcinia to GNC. Def.'s App. Ex. 1 at p. 172.

In March 2013, GNC asked RWN for a price reduction for Garcinia to facilitate that product's retail launch. RWN agreed to reduce the cost from $14.00/unit to $12.25/unit so that the retail price could drop from $39.99/unit to $34.99/unit. Def.'s App. Ex. 1 at p. 172. On April 12, 2013, GNC requested that RWN confirm the correct cost. Def.'s App. Ex. 1 at pp. 154–60; Def.'s Statement at p. 7, ¶ 41; Pl.'s Resp. to Def.'s Statement at p. 4, ¶ 41. Various GNC and RWN personnel exchanged emails to ensure that the Garcinia purchase order reflected the reduced price. *Id.* On April 13, 2013, however, Wright emailed GNC requesting that the Garcinia purchase orders be valued at $14.00/unit "moving forward." GNC agreed. The parties dispute the precise meaning of that email exchange, specifically—whether the phrase "moving forward" meant that the price reduction was terminated, and the original price was restored. Def.'s Statement at pp. at 8–9, ¶¶ 43–47; Pl.'s Resp. to Def.'s Statement at pp. 4–5, ¶¶ 43–47.

In May 2013, GNC adjusted the retail price back up to $39.99/unit but continued to pay RWN $12.25/unit. Def.'s App. Ex. 1 at p. 172. RWN ultimately became aware of, and dissatisfied with, the pricing discrepancy.[4] On May 14, 2014, Chiaverini emailed GNC Director of

---

[4] Although the parties dispute who raised the discrepancy issue first, this is not a dispute of material fact. *See* Def.'s Statement at p. 14, ¶ 84 ("In the Spring of 2014, Right Way advised GNC that there was a discrepancy between the per-unit price GNC was paying Right way for the Garcinia product ($12.25/unit and the per unit price GNC should have been paying Right Way ($14.00/unit)"); *see also id.* ("The first time that the price became an issue was on May 14, 2014, when GNC's Director of Merchandising, John Telencho, raised the issue of price with Right Way.").

Merchandising John Telencho ("Telencho"), advising him of the discrepancy. Pl.'s App. Ex. C at p. 2; Pl.'s App Ex. D at p. 3, ¶ 7; Def.'s App. Ex. 1 at p. 164; Def.'s Statement at p. 9, ¶ 57; Pl.'s Resp. to Def.'s Statement at p. 6, ¶ 57. That message initiated roughly six months of discussion between the parties. Pl.'s App. Ex. D at p. 3, ¶ 8; Def.'s App. Ex. 1 at pp. 24, 33, 172, 175. All the while, GNC continued to purchase Garcinia from RWN. Def.'s Statement at p. 14, ¶ 86.

On October 20, 2014, Wright sent a letter to GNC outlining RWN's position on the dispute. Pl.'s App. Ex. D at p. 3, ¶ 10; Pl's App. Ex. E at pp. 2–4; Def.'s Statement at p. 14, ¶ 87. Wright sent another letter on December 23, 2014, stating that although RWN accepted the reduced Garcinia price at first, adjustments to the unit price should be commensurate with that of the retail price. Thus, RWN's position was that GNC should adjust the unit price to $14.00/unit to match the retail price adjustment from $34.99/unit to $39.99/unit. Def.'s Statement at p. 9, ¶ 60; Pl.'s Resp. to Def.'s Statement at p. 7, ¶ 60.

*B. Cerebral Success*

GNC continued to do business with RWN notwithstanding the Garcinia pricing dispute. In late July/early August 2014, for example, the parties executed Addendum M to the Purchase Agreement. Addendum M memorialized the parties' agreement for GNC to sell Cerebral Success for $24.50 per unit. Pl.'s App. Ex. A at pp. 28–30; Pl.'s App. Ex. D at p. 4, ¶ 21; Def.'s Statement at p. 21, ¶ 109. Cerebral Success is a cognitive performance product that purportedly increases focus, memory, and overall health. Def.'s Statement at p. 20, ¶ 107. Addendum M originally contained an exclusivity provision: "GNC will only carry this product within this category and no other product of its likeness for 1 year." On April 29, 2015, the parties modified Addendum M by

deleting the exclusivity provision. Pl.'s App. Ex. A at p. 28.[5] GNC began selling Cerebral Success in October 2014. Def.'s Statement at p. 21, ¶ 111.

### C.  Green Coffee Bean+Energy

RWN sold Green Coffee Bean+Energy to GNC in 2013.  In 2015, six class action lawsuits were filed against GNC relating to that product.  The plaintiffs in those suits alleged, among other things, that Green Coffee Bean+Energy was a false and misleading product because it used two non-dietary ingredients that are allegedly dangerous substances: *acacia rigidula* and Betamethylphenethylamine ("BMPEA").  Responsive Appendix to Plaintiff's Brief in Opposition to Defendant's Motion for Partial Summary Judgment/Reply Brief in Support of Motion for Partial Summary Judgment (ECF No. 69) ("Pl.'s App. to Br. in Opp.") Ex. C at pp. 2, 16–26, 30–31, ¶¶ 3, 53–78, 88; Pl.'s App. to Br. in Opp. Ex. D at pp. 10, 12, 19–20, ¶¶ 36–38, 43, 72–78.  GNC notified RWN of these lawsuits and requested indemnification under Paragraph 9 of the Purchase Agreement.  Def.'s Statement at p. at 6, ¶ 32; Pl.'s Resp. to Def.'s Statement at p. 3, ¶ 32.  RWN never paid.

### III.  The Settlement

On March 20, 2015, the parties appeared to have settled their differences.  GNC proposed to pay RWN $1.75/unit for every Garcinia unit that it originally paid $12.25/unit instead of $14.00/unit.  The final proposed "compensation" payment totaled $1,010,000.00.  GNC also proposed to continue to do business with RWN, forgo franchise chargebacks, forgo indemnification under Paragraph 9 of the Purchase Agreement related to the six class-action

---

[5] Although the parties dispute when RWN became aware that the exclusivity term was being violated, this is not a dispute of material fact. *See* Def.'s Statement at pp. 21–22, ¶¶ 110, 112 (claiming that GNC sold comparable products in April 2015); *see also id.* (noting that the exclusivity term was deleted and that RWN knew of GNC's comparable products as early as October 2014).

lawsuits implicating Green Coffee Bean+Energy, and return RWN products for credit within six weeks.[6] RWN agreed by a March 20, 2015 email from Wright, that stated, "This seems fair. I AGREE. lets move forward."

Chiaverini emailed GNC a spreadsheet containing information needed to facilitate the return of RWN products. Pl.'s App. to Br. in Opp. Ex. B at pp. 1–6. Consistent with the terms of the parties' settlement agreement, on April 1, 2015, GNC issued a check for $239,325.00 to RWN and represented that the balance of the compensation payment would be forthcoming. Pl.'s App. Ex. D at pp. 3–4, ¶¶ 11–12, 15; Pl.'s App. Ex. F at pp. 2–3; Pl.'s App. Ex. G at p. 2; Def.'s App. Ex. 1 at pp. 177, 179, 225; Def.'s Statement at pp. at 10, 15–16, ¶¶ 61–62, 89–93; Pl.'s Resp. to Def.'s Statement at p. 7, ¶¶ 61–62.

Wright reached out to GNC personnel to schedule a meeting to ensure a resolution of the Garcinia pricing discrepancy. Pl.'s App. Ex. L at pp. 2–4; Pl.'s App Ex. M at p. 2. On April 29, 2015, Wright had two meetings with GNC personnel at GNC headquarters. First, he had breakfast with Mike Archibald ("Archibald"), the CEO of GNC. Archibald assured Wright that GNC would honor the terms of the March 20, 2015 settlement agreement. Pl.'s App. Ex. D at p. 5, ¶ 26. About three hours later, Wright met with Mitchell. Mitchell informed Wright of several new developments. GNC decided to freeze RWN's account and reverse the $239,325.00 settlement payment issued on April 1, 2015, because RWN allegedly had a negative balance with GNC. GNC would also hold RWN products rather than return them. Pl.'s App. Ex. D at pp. 5–6, ¶¶ 24–25,

---

[6] Though there are varying estimates of the value of the returned RWN products, the difference between them is not a dispute of material fact. *Compare* Pl.'s App. Ex. D at pp. 4, 14 ($918,000.00), *and* Def.'s Statement at p. 23–24, ¶ 119 (same), *with* Def.'s Statement at pp. 18, 24 ¶¶ 100, 119 ($800,000.00).

28–30, 33; Def.'s Statement at pp. at 23–24, ¶ 119.  Even so, hoping to salvage the relationship with GNC, RWN continued to ship GNC products for sale through July 2015.  Pl.'s App. Ex. D at p. 6, ¶ 32.

## IV.  The Aftermath

Wright sent Mitchell several follow up emails after the meeting.  Pl.'s App. Ex. K at pp. 2–3; Pl.'s App. Ex. O at p. 2; Def.'s App. Ex. 1 at pp. 184–85.  On April 22, 2015, Wright notified Mitchell of his concern that GNC was violating Addendum M by selling cognitive performance products competing with Cerebral Success.  Def.'s App. Ex. 1 at p. 191.  Mitchell explained in a February 2016 email that GNC retreated from its original settlement proposals because GNC's new Chief Financial Officer ("CFO") did not approve them.  Pl.'s App. Ex. K at pp. 2–3; Def.'s Statement at p. 19, ¶ 102.  The Cerebral Success issue never resolved.

Between 2013 and 2017, GNC sold over 60,000 units of Garcinia, which equated to $20,000,000.00 in revenue.  Pl.'s App. Ex. B at p. 2; Def.'s Statement at pp. 13–14, ¶ 83.  All six class actions implicating Green Coffee Bean+Energy were ultimately dismissed.  Notice of Dismissal at 1, *Hubert v. Gen. Nutrition Corp.*, (2:15-cv-01391-MRH) (ECF No. 109) (W.D. Pa. Dec. 12, 2018) (relating to all five *Hubert* cases); Def.'s Statement at p. at 6, ¶ 36; Pl.'s Resp. to Def.'s Statement at p. 3, ¶ 36.  Because the March 20, 2015 settlement agreement dissolved, the parties dispute whether RWN must indemnify GNC for $153,941.13 in legal fees associated with those cases.  The parties also dispute if and to what extent the other provisions in March 20, 2015 settlement agreement and Addendum M are enforceable.

## PROCEDURAL HISTORY

RWN filed its three-count Amended Complaint on March 9, 2018, alleging breach of contract (count one), promissory estoppel (count two), and unjust enrichment (count three).  GNC

filed its Amended Answer and one-count Counterclaim on August 3, 2018, alleging breach of the Purchase Agreement's indemnification provision for failure to pay attorneys' fees arising from the six class action lawsuits implicating Green Coffee Bean+Energy. RWN filed its Answer to GNC's Amended Answer and Counterclaim on August 24, 2018. Plaintiff's Amended Complaint (ECF No. 25) ("Pl.'s Am. Compl.") at pp. 8–10, ¶¶ 47–64; Defendant General Nutrition Corporation's Answer and Affirmative Defenses to the Amended Complaint and Amended Counterclaim (ECF No. 44) ("Def.'s Answer") at p.1, ¶ 1; Plaintiff's Answer (ECF No. 45) ("Pl.'s Answer") at p. 1, ¶ 1.

RWN filed a Motion for Partial Summary Judgment on June 19, 2019 as to count one of its Amended Complaint. Plaintiff's Motion for Partial Summary Judgment (ECF No. 60) ("Pl.'s Mot. for Partial Summ. J.") at p. 2. GNC filed a Motion for Partial Summary Judgment on July 31, 2019, requesting summary judgment as to all three of RWN's claims and on its own counterclaim for indemnification. Defendant's Motion for Partial Summary Judgment and Reply to Plaintiff's Partial Motion for Summary Judgment (ECF No. 64) ("Def.'s Mot. for Partial Summ. J.") at pp. 9–16. The Court conducted oral argument on October 22, 2019. The matter is now ripe for disposition.

## STANDARD OF REVIEW

The Court may grant summary judgment if a movant meets their burden to show that there is no genuine dispute of material fact, and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is "genuine" if a reasonable jury could return a verdict for a nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts and inferences drawn from the facts are construed in favor of a non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (citing *United States Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "[C]ross-motions for summary judgment do not constitute an agreement that if one is rejected the other is warranted. . . ." *Newark Morning Ledger Co. v. United States*, 539 F.2d 929, 932 (3d Cir. 1976) (internal citation omitted).

A motion for partial summary judgment involves the same standards as a motion for full summary judgment. *Pettengill v. United States*, 867 F. Supp. 380, 381 (E.D. Va. 1994). "Partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case." FED. R. CIV. P. 56 advisory committee's note to the 1946 amendment. A court cannot enter partial summary judgment if there is only a single claim. *RePass v. Vreeland*, 357 F.2d 801, 805 & n.3 (3d Cir. 1966) (citing *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435 (1956); and then citing *Marino v. Nevitt*, 311 F.2d 406 (3d Cir. 1963)). Motions for partial summary judgment are generally disfavored because they are resolved by orders that cannot be appealed until final adjudication. As a result, they are only permitted if they benefit the parties and serve the interest of judicial economy. *RePass*, 357, F.2d at 805 (citing *Panichella v. Penn. R. Co.*, 252 F.2d 452 (3d Cir. 1958)); *Bruschini v. Bd. of Educ. of Arlington Cent. Sch. Dist.*, 911 F. Supp. 104, 106 (S.D.N.Y. 1995).

### ANALYSIS

The parties' competing claims can be distilled into two overarching issues. First, whether the March 20, 2015 settlement agreement constituted an enforceable settlement agreement—an accord to the parties existing agreement. Second, if and to what extent GNC violated Addendum M to the Purchase Agreement. For the reasons discussed below, the Court finds that the March 20, 2015 settlement agreement was an enforceable accord to the Purchase Agreement. GNC violated the accord by, among other things, reversing its compensation for the Garcinia pricing

discrepancy and withdrawing the waiver of indemnification. Because RWN's claims for promissory estoppel and unjust enrichment are pleaded in the alternative, they are resolved ipso facto by the breach of contract analysis. Thus, as to the issues covered by the March 20, 2015 agreement, the Court holds that there is no genuine issue of material fact and will grant summary judgment in RWN's favor and against GNC.

However, as explained herein, the Court cannot grant summary judgment on the issue of liability under the exclusivity provision regarding Cerebral Success. Questions of fact remain on whether the parties intended the amendment of Addendum M, revoking the exclusivity provision, to have retroactive effect. This is an issue that will have to be decided by a jury.

## I.   The Alleged March 20, 2015 Settlement Agreement

Three questions are subsumed within the issue of whether either party is entitled to partial summary judgment on the breach of contract allegations arising from the March 20, 2015 settlement agreement:  1) whether the March 20, 2015 settlement agreement constituted an enforceable accord, and if so, 2) whether GNC breached, and 3) whether GNC is liable for damages.[7] For the reasons set forth below, the Court concludes that the record clearly requires an answer to all three questions of "yes." The March 20, 2015 settlement agreement consisted of an offer, acceptance, and consideration. GNC ultimately reneged on the accord, a decision that renders it liable for damages.

### A.   The Settlement Agreement Was an Accord

A breach of contract claim consists of three elements:  1) formation, 2) breach, and 3) damages. *Norfolk S. R. Co. v. Pittsburgh & W. Va. R.*, 153 F. Supp. 3d 778, 806 (W.D. Pa. 2015)

---

[7] The parties do not dispute choice of law. Pennsylvania law applies. *Cf. Westfield Ins. Co. v. Bellevue Holding Co.*, 856 F. Supp. 2d 683, 691 & n.1 (E.D. Pa. 2012).

(quoting *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)); *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010) (citing *Hart v. Arnold*, 884 A.2d 316, 322 (Pa. Super. 2005)). Contract formation requires an offer, acceptance, and consideration. *Yarnall v. Almy*, 703 A.2d 535, 538–39 (Pa. Super. 1997) (citing *Jenkins v. Cnty. of Schuylkill*, 658 A.2d 380, 383 (Pa. Super. 1995)). If a response is conditional and materially alters the terms of the offer, it is not an acceptance. *Id.* at 539 (citing *Thomas A. Armbruster, Inc. v. Barron*, 491 A.2d 882, 887 (Pa. Super. 1985)). The classic Holmesian definition of the bargain theory of consideration adopted by Pennsylvania courts is that "the promise must induce the detriment and the detriment must induce the promise." *Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Penn.*, 895 A.2d 595 (Pa. Super. 2006) (citing JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS § 60 (3d ed. 1990)); *see also* OLIVER WENDELL HOLMES, JR., THE COMMON LAW & OTHER WRITINGS 293–94 (Legal Classics Library (1982) (1881) ("The root of the whole matter is the relation of reciprocal conventional inducement, each for the other, between consideration and promise."). The test for the enforceability of a contract is whether 1) the parties manifest an intent to be bound, 2) there are sufficiently definite terms, and 3) there was consideration. *ATACS Corp. v. Trans. World Commc'ns, Inc.*, 155 F.3d 659 (3d Cir. 1998) (citing cases).

An accord is a type of contract that stems from an agreement between an obligee and an obligor on an original agreement. The obligee accepts compensation from an obligor less than what it was originally owed in order to resolve a disputed claim. *See Walney v. Swepi, LP*, No. 13-102 Erie, 2016 WL 2766037, at **1, 1 (W.D. Pa. May 13, 2016) (quoting *Hagerty Oil Co. v. Chester Cty. Sec. Fund, Inc.*, 375 A.2d 186, 187 (Pa. Super. 1977)); *Law v. Mackie*, 95 A.2d 656, 660 (Pa. 1953). "The same elements are necessary to show the existence of an 'accord and satisfaction' as to show the existence of any contract." *Brunswick Corp. v. Levin*, 276 A.2d 532,

534 (Pa. 1971). In the context of accord and satisfaction, consideration requires there to be a reasonable dispute between the parties. *Id.* If the terms of an accord are breached, the non-breaching party can either enforce the accord or enforce the prior agreement. *Nowicki Constr. Co. v. Panar Corp., N.V.*, 492 A.2d 36, 40 (Pa. Super. 1985) (citing *Zager v. Gubernick*, 208 A.2d 45, 49 (Pa. Super. 1965); and then citing RESTATEMENT (SECOND) OF CONTRACTS § 281 (Am. Law. Inst. 1981)).

There is no dispute that the three founding documents for the deal between RWN and GNC—the Purchase Agreement, Vendor Book, and Purchase Order—formed a contract. So too with Addendum G authorizing the sale of Garcinia and Green Coffee Bean+Energy. What is disputed is whether the March 20, 2015 settlement agreement constituted an enforceable settlement of the parties' dispute. The Court finds that there was an accord. On March 20, 2015 at 5:37 p.m., Telencho emailed Wright a proposal on behalf of GNC to fix the Garcinia pricing discrepancy by compensating RWN. Pl.'s App. Ex. F at pp. 2–3. Telencho also proposed that GNC continue to do business with RWN, forego franchise chargebacks, waive indemnification for the attorneys' fees associated with the six class-action lawsuits against GNC implicating Green Coffee Bean+Energy, and return RWN products for credit within six weeks. That was the offer. At 6:07 p.m., Wright replied on behalf of RWN, "Good news, This seems fair. I AGREE. lets move forward. If you would, please send the $239,325 first of next week." Pl.'s App. Ex. G at p. 2. That was the acceptance. The proposals in the offer amending the parties' business relationship to RWN's favor and GNC's detriment—that was the consideration. Thus, as a matter of law, the March 20, 2015 agreement was a binding accord.

GNC contends that the founding documents preclude a finding by the Court that the March 20, 2015 settlement agreement constituted an accord. In the alternative, GNC argues that the elements for contract formation are unsatisfied. Neither argument stands up to scrutiny.

Two provisions within the founding documents are pertinent to GNC's argument. First, Purchase Agreement Section F states that if there is a conflict between the Purchase Agreement and the Vendor Agreement, the terms of the Purchase Agreement control. Section F also provides that no modification to the Purchase Agreement can be made unless it is in writing and it is signed by both parties. Pl.'s App. Ex. A at p. 5, ¶ F. Second, the Vendor Book contains the Purchase Order Form, which states in Section 6 that "[t]he parties agree that the total price stated in the purchase order contains all the charges to be paid by GNC to [RWN]. The price described herein is not subject to escalation of any kind or for any reason." Def.'s App. Ex. 1 at p. 125, ¶ 6. GNC argues that Section 6 prevents the Court from finding that the March 20, 2015 settlement agreement was an accord. Def.'s Br. in Supp. at p. 9.

GNC's interpretation of Purchase Order Form Section 6 is incorrect. Words of common usage in a contract are interpreted in their plain and ordinary sense. *Madison Const. Co. v Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999). The plain meaning of the term "escalate" is to "increase in extent, volume, number, amount, intensity, or scope." *Escalate*, MERRIAM WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/escalation (last visited Oct. 8, 2019, 3:55 p.m.). The use of the term "escalate" in Section 6 illustrates the parties' intent to prohibit the increase of RWN product prices after purchase orders are finalized. *See* Def.'s Br. in Supp. at p. 9. The interplay between the Purchase Agreement Sections 7 and 11 and Purchase Order Form Section 6 demonstrates that while the parties intended to prevent *upward* price adjustments, they also intended to permit *downward* price adjustments to facilitate product

launches.  The instant settlement agreement is not some unilateral, arbitrary price hike by a party in contravention to Addendum G.  It is an attempt to fix a pricing discrepancy resulting from GNC's deviation from the terms of the original Garcinia pricing arrangement.  Section 6 may preclude addenda renegotiating the original price terms of products sold under the Purchase Agreement, but it cannot be reasonably read to bar accords intended to remedy pricing discrepancies.  There is no language in Section 6 explicitly or implicitly prohibiting accords.

The founding documents contain a provision applicable to accord and satisfaction.  But that provision is not Purchase Order Form Section 6.  It is Purchase Agreement Section 7, which governs modification.  Since an accord and satisfaction is a way to modify the original Purchase Agreement, Section 7 logically controls.  Under a plain reading of Section 7, an accord is proper so long as it is in writing and signed by both parties.  *See* Pl.'s App. Ex. F at pp. 2–3. Instantly, the March 20, 2015 settlement agreement modifies the Purchase Agreement and impacts several addenda, including Addendum G.  It was executed by both parties.  Section 7, therefore, is not a bar to contract formation because both of its criteria were satisfied.  Moreover, the fact that both criteria were satisfied points to the fact that a contract was formed.

The Court rejects GNC's argument that there was no consideration.  The parties manifested an intent to be bound.  That intent is evidenced by their mutual steps to follow through.  Chiaverini, for example, emailed GNC a spreadsheet containing information designed to facilitate the return RWN products.  Pl.'s App. to Br. in Opp. Ex. B. at pp. 1–6.  RWN concedes that it sent a check for $239,325.00 as a first installment of the compensation for the Garcinia pricing discrepancy.  That check is consideration par excellence.  The March 20, 2015 settlement agreement formed an enforceable accord.

*B. GNC Breached the Accord*

The next question is whether there was breach. RWN's position is that GNC breached its duty under the accord to continue to do business with RWN, waive indemnification for class action lawsuits implicating Green Coffee Bean+Energy, forgo chargebacks on RWN's account, and return around one million dollars' worth of RWN products. More than that, GNC also "reversed" its $239,325.00 payment intended to fix the Garcinia pricing discrepancy. Pl.'s Br. in Supp. at pp. 10–11. As noted at oral argument, it is effectively impossible for GNC to argue that there was no breach. Nevertheless, GNC emphasizes that the reason it sold RWN products rather than return them was because they would have otherwise expired and become useless. In so doing, GNC prevented chargebacks to RWN's account and spared RWN shipping expenses. Def.'s Br. in Supp. at 13. The Court does not find this argument convincing.

The Court's finding that the March 20, 2015 settlement agreement was an enforceable accord is ultimately a fait accompli to GNC arguing that there was no material breach. The evidence of noncompliance is overwhelming. The accord placed a duty on GNC to pay RWN $239,325.00. The parties dispute whether GNC had a right to sell RWN products through markdowns to mitigate losses rather than returning them. Pl.'s App. Ex. D at p. 4, ¶ 18; Pl.'s App. Ex. I at pp. 2–5; Def.'s Statement at p. at 11, ¶¶ 66–73; Pl.'s Resp. to Def.'s Statement at p. 7, ¶¶ 66–73. Although GNC insists in its brief that it was acting in RWN's best interest in doing so, that argument is not persuasive. Def.'s Br. in Supp. at p. 13. It is contradicted by another GNC statement—that the products could not be sold because they expired. If the products expired, GNC could not possibly have sold them either. *See id.* at 13 ("The unsold product had surpassed its expiration and could no longer be sold. . . . Ultimately, the product was left for GNC to sell, which Wright conceded is the best way to handle such a matter."); *see also* Pl.'s App. Ex. H at p. 7

(demonstrating that GNC made money selling RWN products it was supposed to return). According to GNC, Wright conceded that it was appropriate for GNC to sell RWN products rather than return them. Def.'s Reply at p. 5. In fact, Wright stated that he fully expected the returns and did not know why GNC failed to return the products. Def.'s App. Ex. 1. at p. 32. RWN had the right under the accord to sell returned products regardless of what agreements necessary to facilitate those sales it had in place. *Compare* Pl.'s App. Ex. D at p. 4, ¶ 14 (declaring RWN's intent to sell the returned products), *and* Pl.'s Resp. to Def.'s Statement at p. 9, ¶ 72 (same), *with* Def.'s Statement at p. 11, ¶ 72 ("Right Way had no agreements to sell any of the products that were to be returned."). Finally, GNC's freezing of RWN's account was inconsistent with its duty to forgo chargebacks, maintain business relations, and waive indemnification for the class action lawsuits against it implicating RWN products. By reneging on the March 20, 2015 settlement agreement, GNC committed material breach.

### C. GNC Is Liable for Damages

RWN requests compensatory and consequential damages. Pl.'s Am. Compl. at p. 10. GNC offers two counterarguments. First, GNC argues that Purchase Agreement Section 10 bars damages not accrued in the "immediately preceding six months." Def.'s Reply at p. 6. Second, GNC argues that damages are not recoverable because they are not sufficiently foreseeable. Def.'s Br. in Supp. at pp. 13–14. The Court does not accept either argument.

GNC's first argument is that Purchase Agreement Section 10 precludes RWN from recovering damages for lost profits and limits damages otherwise recoverable to those accrued within the last six months. Pennsylvania law allows plaintiffs to recover consequential damages in the form of lost profits. *Smith*, 655 A.2d at 1021 (citing *AM/PM Franchise v. Atl. Richfield*, 584

A.2d 915, 920 (Pa. 1990)). So too with compensatory damages. Parties are free, however, to contract out of awarding damages in the event of litigation. Purchase Agreement Section 10 states,

> In no event shall buyer be liable to seller under this agreement (whether in tort, in strict liability, in contract, or otherwise) for any (i) indirect, incidental, special, exemplary, or consequential damages, including damages for lost profits, even if buyer has been advised off the possibility of such damages, or (ii) amount that exceeds the aggregate fees paid by buyer to seller under this agreement for the immediately preceding six months. The existence of more than one claim will not enlarge or extend these limits.

Pl.'s App. Ex. A at p. 3, ¶ 10. The problem with invoking Purchase Agreement Section 10 is that what is at issue is not the enforceability of the original Purchase Agreement, but rather the March 20, 2015 settlement agreement. The Court's finding that the March 20, 2015 settlement agreement was an enforceable accord defeats GNC's preclusion argument. To the extent that Purchase Agreement Section 10 ordinarily would bar recovery of damages, GNC superseded the applicability of that provision by entering the March 20, 2015 accord. Because the elements for breach are satisfied, the Court will grant partial summary judgment in favor of RWN on count one of its Amended Complaint with respect to liability for breach of the March 20, 2015 accord. The final amount of damages awarded will be determined at trial by a jury.

GNC's second argument is that the damages RWN seeks are too speculative to be awarded in this case. The general rule in Pennsylvania is that an injured party must establish damages with reasonable certainty. *Spang & Co. v. United States Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988) (citing RESTATEMENT (SECOND) OF CONTRACTS, *supra*, at § 352; and then citing MURRAY, *supra*, at § 226)). The Restatement notes that "[d]amages need not be calculable with mathematical accuracy and are often best approximate." RESTATEMENT (SECOND) OF CONTRACTS, *supra*, at § 352 comm. A. Recovery is not barred if damages clearly resulted from a defendant's conduct.

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 519 (M.D. Pa. 2010) (citing *Smith v. Penbridge Assocs.*, 655 A.2d 1015, 1021 (Pa. Super. 1995)).

The Court finds that the damages RWN seeks are foreseeable, ascertainable, and readily calculable. *See Quinn v. Bupp*, 955 A.2d 1014, 1021 (Pa. Super. 2008). The goalposts for determining the final damages recoverable in this suit are simply the $239,325.00 repayment for the Garcinia pricing discrepancy and the fair market value of RWN products that were supposed to be returned under the March 20, 2015 settlement agreement. *See* Pl.'s App. Ex. H at p. 7; Pl.'s Br. in Supp. at p. 12. There are no disputes of material fact inhibiting a jury's calculation of damages.

Lastly, the Court will deny GNC's Motion for Partial Summary Judgment and dismiss its Amended Counterclaim, as the indemnification dispute is resolved by the enforceability of the accord's indemnification waiver.

## II. Addendum M to the Purchase Agreement

The first count of RWN's Amended Complaint addresses not only the Garcinia pricing discrepancy, but also the dispute over whether GNC violated its duty to sell Cerebral Success as its exclusive cognitive performance product. Pl.'s Amended Compl. at p. 9, ¶ 50. Purchase Agreement Section H provides that the agreement can only be modified if it is in writing and signed by both parties. The parties memorialized the sale of Cerebral Success by signing two versions of Addendum M. Pl.'s App. Ex. A at pp. 28–30.

The first version of Addendum M, signed by RWN and GNC representatives on July 31, 2014, and August 7, 2014, respectively, states that "GNC will only carry this product within this category and no other product of its likeness for 1 year." Pl.'s App. Ex. A at p. 30. The second version, signed by both parties on April 29, 2015, modified the addendum as follows:

1. The following sentence contained in Addendum #M of the Purchasing Agreement is deleted in its entirety and has no force or effect:

   "GNC will only carry this product within this category and no other product of its likeness for 1 year."

2. All other terms and conditions of the Purchasing Agreement remain operative and unchanged and this Addendum is an integral part of the Purchasing Agreement.

Pl.'s App. Ex. A at pp. 28–29. RWN asserts that GNC breached Addendum M by selling eight other products within Cerebral Success' category by April 2015. Pl.'s Br. in Supp. at p. 13. GNC responds that the second version's removal of the exclusivity term forecloses liability. This issue can be distilled into two questions: 1) whether the second version of Addendum released GNC from all liability, including liability for non-exclusivity before the date of the amendment to Addendum M, and 2) if so, whether there is a dispute of material fact as to whether RWN entered the second version under duress—which would nullify the amendment.

RWN characterizes the dispute as turning upon whether the second version of Addendum M constituted a release. A release is the abandonment of a claim against a person against whom the claim is made. *Compl. of Bankers Trust Co.*, 752 F.2d 874, 883 (3d Cir. 1984). RWN considers the lack of any express language clarifying that the second version constitutes a release to be dispositive. Pl.'s Br. in Opp. at 13. GNC, on the other hand, maintains that there is no need for a release because the exclusivity provision was deleted in its entirety. It argues that the parties modified Addendum M by eliminating exclusivity provision, so it is as if the exclusivity term *never existed*. In other words, GNC argues that the amendment to Addendum M has retroactive effect, absolving it from any liability for violating the exclusivity provisions predating the amendment.

The amendment to Addendum M contains no durational language. As a result, it is difficult to determine, from the language alone, whether the elimination of liability was retrospective or merely prospective. In other words, it is unclear whether the elimination of liability for selling other cognitive performance products extends only to the period after the second version was executed, or also to the intervening period between the execution of the first and second versions as well. Not surprisingly, the parties take different positions on this issue.

The Court holds that the amendment to Addendum M is ambiguous as to whether it has retroactive effect. In cases of ambiguity, the Court must interpret a contract against the drafter. *Rusiski v. Pribonic*, 515 A.2d 507, 511 (Pa. 1986) (citing *In re Estate of Breyer*, 379 A.2d 1305, 1310 (Pa. 1977)). As noted at oral argument, however, there is nothing in the record conclusively establishing who drafted Addendum M or its amendment. That will be one fact that a jury has to determine. Ultimately, this issue will hinge on an assessment of the parties' intent in entering the amendment to Addendum M. Accordingly, the Court cannot grant partial summary judgment on this aspect of RWN's first count.

Finally, RWN insists that Wright signed the second version of Addendum M because he was under economic duress. According to RWN, Mitchell's news that GNC would be freezing RWN's account hit Wright like a bombshell. Wright apparently had no choice but to agree to the modification of Addendum M because of the economic pressure on his company. Pl.'s App. Ex. D at pp. 4–5, ¶¶ 28–33; Plaintiff's Brief in Opposition to Defendant's Motion for Partial Summary Judgment/Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment (ECF No. 70) ("Pl.'s Br. in Supp.") at pp. 13–14. The Court is not persuaded by this argument.

Under Pennsylvania law, duress is defined as "that degree of restrain or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to

overcome the mind of a person of ordinary firmness. . . ." *Carrier v. William Penn Broadcasting Co.*, 233 A.2d 519, 430–31 (Pa 1967) (quoting *Smith v. Lenchner*, 205 A.2d 626 (1964)). Mere opportunity to consult with an attorney before entering into a contract defeats an allegation of economic duress. *Degenhardt v. Dillon Co.*, 669 A.2d 946, 950–51 (Pa. 1996).

There is no dispute of material fact as to whether there was a threat of bodily harm or the opportunity for RWN to consult an attorney. *Compare* Pl.'s Br. in Supp. at pp. 12–13 (providing no allegation of threats of bodily harm or lack of opportunity to consult counsel), *with* Pl.'s Br. in Opp. at pp. 12–14 (same). Wright is the CEO of RWN and presumably a sophisticated businessman. He had options. He could have brought an attorney to his meetings at GNC on April 29, 2015. If not, he could have spoken with an attorney by phone or left GNC to speak with an attorney in person after the meeting with Mitchell did not go as planned. But he did none of those things. Instead, he agreed to modify Addendum M. If he wanted to sue GNC for selling products competing with Cerebral Success, he should not have signed an agreement to eliminate the exclusivity provision. Because he did, the defense of economic duress is inapplicable. The Court will not grant summary judgment on this issue. A jury will determine whether GNC is liable under the terms of second version of Addendum M.

## CONCLUSION

AND NOW, this 15ᵗʰ day of November 2019, for the foregoing reasons IT IS HEREBY **ORDERED** that RWN's Motion for Partial Summary Judgment (ECF No. 60) is **GRANTED** in part and **DENIED** in part. RWN's Motion for Partial Summary Judgment on count one of its Amended Complaint related to liability for breach of the March 20, 2015 accord is **GRANTED.** RWN's Motion for Partial Summary Judgment on count one of its Amended Complaint related to liability for breach of Addendum M is **DENIED**. Because partial summary judgment is granted

in favor of RWN on count one of its Amended Complaint related to the March 20, 2015 accord, RWN's motion related to counts two and three pleaded in the alternative in its Amended Complaint is **DENIED** as moot. GNC's Motion for Partial Summary Judgment (ECF No. 64) is **DENIED.** And it is further ordered that GNC's Amended Counterclaim (ECF No. 44) is **DISMISSED** because the indemnification waiver in the March 20, 2015 accord is enforceable.

**WILLIAM S. STICKMAN IV**
**UNITED STATES DISTRICT JUDGE**